John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
280 S. Beverly Drive, PH
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

Kristen Lake Cardoso (SBN 338762)
**KOPELOWITZ OSTROW P.A.**
1 West Las Olas Blvd., Ste. 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Email: cardoso@kolawyers.com

Carly M. Roman (SBN 349895)
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Email: croman@straussborrelli.com

*Attorneys for Plaintiffs and Proposed Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Ingram Micro Data Breach Litigation* | Case No. 2:25-cv-06301-JFW (KSx) <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Damond Brown, Bill Chism, Jane Doe, Edward Ndiba, and Charles Rodden (collectively, "Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Ingram Micro Americas Inc., ("Ingram" or "Defendant"), alleging as

follows, based upon information and belief, investigation of counsel, and personal knowledge of Plaintiffs.

## INTRODUCTION

1.      This class action arises from Defendant's failure to protect its current and former employees' and clients' highly sensitive data.

2.      Ingram recently discovered it had lost control over its computer network and that on around July 5, 2025, it "identified ransomware on certain of its internal systems."[1] On information and belief, the cybercriminal group known as SafePay stole files containing highly sensitive personal information stored on Defendant's computer network.

3.      Ingram has not publicly disclosed who was impacted (*e.g.,* current employees, former employees, clients, customers, etc.) or the complete categories of information compromised in the Data Breach. However, on information and belief, Defendant's current and former employees' personally identifiable information ("PII"), including at least their names and Social Security numbers, were stolen.

4.      On July 5, 2025, Ingram published the Notice on its website, announcing the Data Breach had recently been discovered. However, on information and belief, Data Breach victims have not received individual notice.

5.      Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and

---

[1] Statements made on Defendant's website regarding the Data Breach ("Notice") are attached hereto as **Exhibit A**.

suppliers in handling and securing the PII of Plaintiffs, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering it an easy target for cybercriminals.

6.     Defendant's Notice obfuscates the nature of the Data Breach and the threat it posed. The Notice failed to disclose how many people were impacted, the categories of information acquired, who was impacted (*e.g.*, employees or customers or both), how long cybercriminals had access to private information, how the Data Breach happened, when Defendant stopped the Data Breach, and why Defendant waited before notifying victims that cybercriminals had gained access to their highly private information.

7.     Defendant's deliberate failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

8.     Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

9.     In failing to adequately protect its current and former employees' and clients' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its current and former employees and clients.

10.     Plaintiffs and the Class are victims of Defendant's negligence and inadequate cybersecurity measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust

CONSOLIDATED CLASS ACTION COMPLAINT

when Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

11.     Plaintiffs are victims of the Data Breach.

12.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiffs and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

13.     Plaintiffs seek on behalf of themselves and the Class, monetary damages and injunctive relief including lifetime credit and identity theft monitoring.

## PARTIES

14.     Plaintiff Damond Brown is a natural person and citizen of Oakland, Florida, where he intends to remain.

15.     Plaintiff Bill Chism is a natural person and citizen of San Tan Valley, Arizona, where he intends to remain.

16.     Plaintiff Jane Doe is a natural person and citizen of Erie County, New York, where she intends to remain.

17.     Plaintiff Edward Ndiba is a natural person and citizen of North Richland Hills, Texas, where he intends to remain.

18.     Plaintiff Charles Rodden is a natural person and resident of Shallotte, North Carolina, where he intends to remain.

19.     Defendant is a California based corporation with its headquarters and principal place of business located at 3351 Michelson Drive, Suite 100 Irvine, CA 92612.

-4-
CONSOLIDATED CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Members of the proposed Class are citizens of different states than Defendant, and there are over 100 putative Class members.

21.     This Court has personal jurisdiction over Defendant because it maintains its headquarters and principal place of business in this District, regularly conducts business in Irvine, California, and has sufficient minimum contacts in Irvine, California.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1)–(d) because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

**BACKGROUND**

***Defendant Collected and Stored the PII of Plaintiffs and the Class***

23.     Ingram states it is a "is a leading technology company for the global information technology ecosystem" that reaches "90% of the global population" by "bringing products and services from technology manufacturers and cloud providers to a highly diversified base of business-to-business technology experts."[2]

---

[2] Ex. A.

CONSOLIDATED CLASS ACTION COMPLAINT

24.    Ingram states it has over 50 offices worldwide,[3] generated $48 billion dollars in sales in 2024, had 200 countries served by its sales team, employes over 23,500 associates, and has a 95% score on the HRC Foundation's Corporate Equality Index.[4]

25.    In the regular course of its business, Ingram collects and maintains the highly private PII of its current and former employees and clients.

26.    In collecting and maintaining its employees' and clients' PII, Ingram agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

27.    Ingram understood the need to protect its current and former employees' PII and prioritize its data security.

28.    In its Privacy Statement[5], Ingram states: "Personal Data will be protected against unauthorized access and processing using appropriate technical and organizational security measures and controls; and…Personal Data collected by Ingram Micro will be retained as identifiable data for no longer than necessary to serve the purposes for which the Personal Data was collected."[6]

---

[3] *Locations,* INGRAM, https://www.ingrammicro.com/en-us/company/about-us/locations/ (last visited July 11, 2025).

[4] *About Us,* INGRAM, https://www.ingrammicro.com/en-us/company/about-us (last visited July 11, 2025).

[5] Ingram states that its employees receive a "separate privacy notice;" however, on information and belief, the text of this separate statement is substantially similar to its public "Privacy Statement."

[6] *Privacy Statement,* INGRAM, https://www.ingrammicro.com/en-us/legal/privacy-statement (last visited July 11, 2025).

29.    Ingram also represents: "Ingram Micro uses technical and organization controls and measures designed to secure and protect your Personal Data from unauthorized loss, misuse, and disclosure, such as strong user access controls, segmented network architecture, and comprehensive employee policies and training."[7]

30.    Defendant offers cybersecurity products to its clients, stating it "assist[s] partners in addressing complex security challenges with a comprehensive portfolio of solutions, expert services and enablement tools backed by industry expertise."[8]

31.    Defendant offers numerous "security solutions," including "managed security services," "vulnerability management," "security frameworks" and "ransomware protection."[9] Ingram informs its customers that its "Cybersecurity assessment tool" will enable them to "Combat costly cyberattacks and prevalent vulnerabilities in organizations."[10]

32.    Despite claiming to be an expert in cybersecurity and recognizing its duty protect the PII in its care, on information and belief, Ingram has not implemented reasonable cybersecurity safeguards or policies to protect the PII of its current and former employees and clients, or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Ingram

---

[7] *Id.*

[8] *Stay one step ahead of security threats.,* INGRAM, https://usa.ingrammicro.com/cep/app/cms/en-us/solutions/technologies/security (last visited July 11, 2025).

[9] *Id.*

[10] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT

leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees and clients' PII.

***Defendant Failed to Safeguard the PII of Plaintiffs and the Class***

33.    Plaintiff Damond Brown is a former employee of Defendant. Defendant did not notify Plaintiff Brown of the Data Breach.

34.    Plaintiff Bill Chism is a former employee of Defendant. Defendant did not notify Plaintiff Chism of the Data Breach. Rather, he learned about the Data Breach from his former colleagues.

35.    Plaintiff Jane Doe is an employee of Defendant. Defendant did not notify Plaintiff Doe of the Data Breach. Rather, she observed that Defendant's systems were down for days and suspected that a Data Breach had occurred.

36.    Plaintiff Edward Ndiba is a former employee of Defendant. Defendant did not notify Plaintiff Ndiba of the Data Breach. Rather, he saw information about the Data Breach online.

37.    Plaintiff Charles Rodden is a former employee of Defendant. Defendant did not notify Plaintiff Rodden of the Data Breach directly.

38.    As a condition of receiving employment from Defendant, Plaintiffs provided Defendant with their PII.

39.    On information and belief, Defendant collects and maintains its current and former employees' unencrypted PII in its computer systems.

40.    In collecting and maintaining PII, Defendant implicitly agreed that it will safeguard the data using reasonable means according to state and federal law.

41.     On or about July 5, 2025 Defendant published the Notice on its website, entitled "Statement Regarding Cybersecurity," in which it claims to have "recently identified ransomware on certain of its internal systems."[11]

42.     Defendant did not disclose how many people were impacted, but, upon information and belief, the cyberattack impacted Defendant's operations on a global scale. Indeed, on July 7, 2025, Defendant posted an update on its website claiming: "[W]e are now able to process orders received by phone or email from the UK, Germany, France, Italy, Portugal, Spain, Brazil, India, and China" and on July 8, 2025, Defendant claimed: "We are now able to process orders received by phone or email from Austria, Canada, Singapore, and the Nordics, as well as the countries supported by our Miami Export business." [12]

43.     At minimum, residents in Arizona, California, Florida, New York, North Carolina, and Texas were affected.

44.     Defendant did not disclose when it "identified" the cyberattack or how long it lasted, but in a subsequent update on July 8, 2025, Defendant claimed "we believe the  unauthorized access to our systems in connection with the incident is contained and the affected systems remediated."[13]

45.     Therefore, the cyberattack lasted at least three days.

---

[11] Ex. A.
[12] *Id.*
[13] *Cybersecurity Incident,* INGRAM,  https://www.ingrammicro.com/en-us/information (last visited September 15, 2025).

46.    The following day, on July 9, 2025, Defendant represented that it was operational across all countries, but was still in the process of recovering its systems and restoring "relevant services."[14]

47.    The Data Breach shows Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of its employees' and clients' highly private information for an unknown period of time.

48.    Also on July 5, 2025, BleepingComputer, an information security and technology news publication,[15] reported that the ransomware cybercriminal group known as "SafePay" were responsible for the Data Breach.[16]

49.    Employees of Defendant discovered a note from SafePay on their Ingram devices which stated, in part, "Your corporate network was attacked by the SafePay team. Your IT specialists made a number of mistakes in setting up the security of your corporate network, so were able to spend quite a long period of time in it and compromise you…We've spent the time analyzing your data, we know the ins and outs of your corporation. As a result, all files of importance have been encrypted and the ones of most interest to us have been stolen and are now stored on a secure server for further publication on the web with an open access."[17]

---

[14] *Id.*

[15] *See About Bleepingcomputer.com,* BLEEPING COMPUTER, https://www.bleepingcomputer.com/about/ (last visited July 11, 2025).

[16] Lawrence Abrams, *Ingram Micro outage caused by SafePay ransomware attack,* BLEEPING COMPUTER (July 5, 2025) https://www.bleepingcomputer.com/news/security/ingram-micro-outage-caused-by-safepay-ransomware-attack/ (last visited July 11, 2025).

[17] *Id.*

50.    The note further requested a "monetary reward" and stated that Defendant had "7 days to contact us, after this time a blog post will be made with a timer for 3 days before the data is published."



51.    Thus, on information and belief, Plaintiffs' and the Class's PII will be published imminently, or has already been published, on the dark web.

52.    Sources also informed BleepingComputer that SafePay gained access to Ingram's network through the company's GlobalProtect VPN platform, likely using compromised credentials.[18]

53.    Once the Data Breach was discovered, Ingram told its employees in some locations to work from home.[19] Ingram also shut down internal systems, telling

---

[18] *Id.*
[19] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT

employees not to use the company's GlobalProtect VPN access, which was said to be impacted by the IT outage.[20]

54.    The Data Breach impacted Ingram's AI-powered Xvantage distribution platform and its Impulse license provisioning platform.[21]

55.    SafePay's initial ransom note had a deadline of seven days to pay up or a blog post would be made with a timer for three days before the data would be published.

56.    On July 29 or July 30, 2025, SafePay posted that timer, confirming it had stolen 3.5 terabytes of data which would be published within three days.[22]



57.    3.5 terabytes is a massive amount of data and can hold a huge variety of content. For context, 1 terabyte is equivalent to 1,000 gigabytes, and 1 gigabyte is equivalent to 1,000 megabytes. Thus, 3.5 terabytes is equivalent to 3,500,000

---

[20] *Id.*

[21] *Id.*

[22] David Hollingworth, *Exclusive: SafePay ransomware group finally lists Ingram Micro on leak site,* BLEEPING COMPUTER (July 5, 2025) https://www.bleepingcomputer.com/news/security/ingram-micro-outage-caused-by-safepay-ransomware-attack/ (last visited July 11, 2025); *SafePay – Ingram Micro,* RANSOMLOOK, https://www.ransomlook.io/group/safepay (last visited September 15, 2025).

-12-
CONSOLIDATED CLASS ACTION COMPLAINT

megabytes. The entire written works of Shakespeare could fit inside just 5 megabytes.[23]

58.    Ingram's partners are voicing concerns that confidential data from their companies or their customers would be made public by SafePay. "This is highly concerning," said the CEO of a Solution Provider 500 company, who did not want to be identified. "Think of all the confidential data, internal data from VARs like us and customer data, financial data, all of it. I am going to reach out immediately to Ingram to see if I can get any information on this."[24]

59.    To date, Defendant has not made any public statements regarding SafePay or whether it made a ransomware payment. Indeed, the last update to its website was posted on July 9, 2025.[25]

60.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[26]

---

[23] Paulette Kehely, *How Many Documents in a Gigabyte?* (April 2, 2020), DWR EDISCOVERY, https://www.digitalwarroom.com/blog/how-many-pages-in-a-gigabyte (last visited September 15, 2025).
[24] Steven Burke, *Ingram Micro Partners 'Concerned' About Claimed SafePay Data Theft,* CRN (July 31, 2025) https://www.crn.com/news/security/2025/ingram-micro-partners-concerned-about-claimed-safepay-data-theft (last visited September 15, 2025).
[25] *Cybersecurity Incident,* INGRAM, https://www.ingrammicro.com/en-us/information (last visited September 15, 2025).
[26] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited November 20, 2024).

61.    A ransomware attack is a type of cyberattack that is frequently used to target healthcare providers due to the sensitive patient data they maintain.[27] In a ransomware attack the attackers use software to encrypt data on a compromised network, rendering it unusable and demanding payment to restore control over the network.[28] Ransomware attacks are particularly harmful for patients and healthcare providers alike as they cause operational disruptions that result in lengthier patient stays, delayed procedures or test results, increased complications from surgery, and even increased mortality rates.[29] In 2021, 44% of healthcare providers who experienced a ransomware attack saw their operations disrupted for up to a week and 25% experienced disrupted services for up to a month.[30]

62.    Companies should treat ransomware attacks as any other data breach incident because ransomware attacks don't just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[31]    As cybersecurity expert Emisoft warns, "[a]n absence of

---

[27] *Ransomware warning: Now attacks are stealing data as well as encrypting it*, available at https://www.zdnet.com/article/ransomware-warning-now-attacks-are-stealing-data-as-well-as-encrypting-it/

[28] *Ransomware FAQs*, available at https://www.cisa.gov/stopransomware/ransomware-faqs

[29] *Ponemon study finds link between ransomware, increased mortality rate*, available at https://www.healthcareitnews.com/news/ponemon-study-finds-link-between-ransomware-increased-mortality-rate

[30] *The State of Ransomware in Healthcare 2022*, available at https://assets.sophos.com/X24WTUEQ/at/4wxp262kpf84t3bxf32wrctm/sophos-state-of-ransomware-healthcare-2022-wp.pdf

[31] *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends

-14-
CONSOLIDATED CLASS ACTION COMPLAINT

evidence of exfiltration should not be construed to be evidence of its absence […] the initial assumption should be that data may have been exfiltrated."

63.    An increasingly prevalent form of ransomware attack is the "encryption+exfiltration" attack in which the attacker encrypts a network and exfiltrates the data contained within.[32]  In 2020, over 50% of ransomware attackers exfiltrated data from a network before encrypting it.[33] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[34]  And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[35]

64.    On information and belief, even if Defendant paid a ransom, this would not ensure the security of Plaintiffs' and the Class's PII. While ransomware groups usually remove stolen data from their data leak sites when a ransom is paid, there is

---

[32]*The chance of data being stolen in a ransomware attack is greater than one in ten*, available at  https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/
[33] 2020 Ransomware Marketplace Report, available at https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report
[34] *Id.*
[35] *Id.*

no guarantee that the data will be deleted. [36] That data is valuable and can easily be sold to another threat actor, so there is little incentive to delete it.[37]

65.    On information and belief, and according to numerous third parties, the stolen data was published on Safepay's dedicated leak site.[38]

66.    Despite its duties to safeguard PII and despite being a provider of "cybersecurity solutions," Defendant did not in fact follow industry standard practices in securing current and former employees' PII, as evidenced by the Data Breach.

67.    In response to the Data Breach, Defendant contends it "took steps to secure the relevant environment, including proactively taking certain systems offline and implementing other mitigation measures."[39]

68.    Although Defendant fails to expand on what these "mitigation measures" are in any detail, such "measures" if implemented at all, should have been in place before the Data Breach.

---

[36] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/#:~:text=While%20ransomware%20groups%20usually%20remove,little%20incentive%20to%20delete%20it.

[37] *Id.*

[38] *I've confirmed Safepay released Ingram Micro data today,* REDDIT ("It is available on SafePay's victim notification board. For obvious reasons I will not share how to access active Ransomware operator infrastructure." and "Literally found the onion on the 1st Google search I did. Not really a big secret.") at https://www.bleepingcomputer.com/news/security/ingram-micro-outage-caused-by-safepay-ransomware-attack/ (last visited September 15, 2025)

[39] Ex. A.

69.     Because of the Data Breach, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' PII is substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

70.     On information and belief, Defendant failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its employees' PII. Defendant's negligence is evidenced by its failure to prevent the Data Breach, and to stop cybercriminals from accessing the PII it stored in its network.

71.     Furthermore, Defendant's Notice obfuscates the nature of the Data Breach and the threat it posed. The Notice failed to disclose how many people were impacted, the categories of information acquired, who was impacted (*e.g.*, employees or customers or both), how long cybercriminals had access to private information, how the Data Breach happened, when Defendant stopped the Data Breach, and why Defendant waited before notifying victims that cybercriminals had gained access to their highly private information.

### *Defendant Knew—or Should Have Known—of the Risk of a Data Breach*

72.     It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

73.     Data breaches are preventable.[40] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that

---

[40] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

-17-
CONSOLIDATED CLASS ACTION COMPLAINT

occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[41] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[42]

74.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. Data breaches have been on the rise for several years. In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[43]

75.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years. In light of past high profile data breaches at industry-leading companies, including, for example, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or, if acting as a reasonable business, should have known that the PII it collected and maintained would be vulnerable to and targeted by cybercriminals.

---

[41] *Id.* at 17.

[42] *Id.* at 28.

[43]  *2024 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter. org/publication/2024-data-breach-report/ (last visited May 23, 2025).

76.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

77.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in the finance industry, including Defendant.

78.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

79.     This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included extortion and threatening to release stolen data.

80.     In light of the information readily available and accessible before the Data Breach, Defendant, knew or should have known that there was a foreseeable risk that Plaintiffs and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Data breaches are so prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

***Plaintiff Damond Brown's Experience and Injuries***

81.     Plaintiff Damond Brown is a former employee of Defendant and a data breach victim.

82.     At the time of the Data Breach, Plaintiff Brown's PII, was stored on Defendant's systems.

83.     As a condition of receiving employment, Defendant required Plaintiff Brown to provide his PII, including at least his name and Social Security number.

84.     Plaintiff Brown provided his PII to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

85.     Additionally, Plaintiff Brown reasonably expected that his personal information would be destroyed once his employment with Defendant ended.

86.     As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff Brown's PII for theft by cybercriminals and sale on the dark web.

87.     Plaintiff Brown is very careful about sharing sensitive PII. He  stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the Internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendant had he  known of Defendant's lax data security policies.

88.     Defendant deprived Plaintiff Brown of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach. Indeed, Plaintiff Brown has not yet received individual notice.

89.     Plaintiff Brown suffered actual injury from the exposure of his PII — which violates his rights to privacy.

90.     Plaintiff Brown suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property— property that Defendant was required to adequately protect.

91.     As a result of the Data Breach, Plaintiff Brown has spent time and made reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit information. Plaintiff anticipates spending considerable money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

92.     Plaintiff Brown will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft for the remainder of his life that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

93.     Plaintiff Brown fears for his personal financial security. Plaintiff Brown has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach, and how the exposure and loss of his Social Security number will impact him. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

94.     Plaintiff Brown is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of

unauthorized third parties. This injury is worsened by Defendant's failure to promptly inform Plaintiff Brown about the Data Breach.

95.    Plaintiff Brown has experienced a substantial increase in scam and spam phone calls and text messages following the Data Breach, which indicates his PII is already in the hands of criminals.

96.    Once an individual's PII is for sale and accessible on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[44] On information and belief, Plaintiff Brown's name and Social Security number were compromised as a result of the Data Breach.

97.    Plaintiff Brown has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendant's possession despite the fact he is no longer employed by Defendant, is protected and safeguarded from future breaches.

### *Plaintiff Bill Chism's Experience and Injuries*

98.    Plaintiff Bill Chism is a former employee of Defendant and a data breach victim.

99.    At the time of the Data Breach, Plaintiff Chism's PII, including his name and Social Security number, were stored on Defendant's systems.

100.    As a condition of receiving employment, Defendant required Plaintiff Chism to provide his PII.

---

[44] Ryan Toohil, *What do Hackers do with Stolen Information,* AURA (Sept. 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited September 15, 2025).

101.   Plaintiff Chism provided his PII to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

102.   Additionally, Plaintiff Chism reasonably expected that his personal information would be destroyed once his employment with Defendant ended.

103.   As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff Chism's PII for theft by cybercriminals and sale on the dark web.

104.   Plaintiff Chism is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the Internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendant had he known of Defendant's lax data security policies.

105.   Defendant deprived Plaintiff Chism of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach. Indeed, Plaintiff Chism has not yet received individual notice.

106.   Plaintiff Chism suffered actual injury from the exposure of his PII — which violates his rights to privacy.

107.   Plaintiff Chism suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

108.   As a result of the Data Breach, Plaintiff Chism has spent significant time and made reasonable efforts to mitigate its impact, including but not limited to

-23-
CONSOLIDATED CLASS ACTION COMPLAINT

researching the Data Breach, regularly reviewing credit card and financial account statements, and monitoring his credit information. Plaintiff anticipates spending considerable money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

109.    Plaintiff Chism will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft for the remainder of his life that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

110.    Plaintiff Chism fears for his personal financial security. Plaintiff Chism has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach, and how the exposure and loss of his Social Security number will impact him. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

111.    Plaintiff Chism is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's failure to promptly inform Plaintiff Chism about the Data Breach.

112.    Plaintiff Chism has experienced a substantial increase in scam and spam phone calls and text messages following the Data Breach, which indicates his PII is already in the hands of criminals.

113.    Indeed, Plaintiff Chism received an email confirming his information his information was found on the Dark Web.

CONSOLIDATED CLASS ACTION COMPLAINT

114.    Once an individual's PII is for sale and accessible on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[45] On information and belief, Plaintiff Chism's name and Social Security number were compromised as a result of the Data Breach.

115.    Plaintiff Chism has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendant's possession despite the fact he is no longer employed by Defendant, is protected and safeguarded from future breaches.

***Plaintiff Jane Doe's Experience and Injuries***

116.    Plaintiff Jane Doe is an employee of Defendant and a data breach victim.

117.    At the time of the Data Breach, Plaintiff Doe's PII, including at least her name and former name, current and former addresses, Social Security number, health insurance information, and even her children's Social Security numbers, were stored on Defendant's systems.

118.    As a condition of receiving employment, Defendant required Plaintiff Doe to provide her PII.

119.    Plaintiff Doe provided her PII to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

---

[45] Ryan Toohil, *What do Hackers do with Stolen Information,* AURA (Sept. 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited September 15, 2025).

120.   As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff Doe's PII for theft by cybercriminals and sale on the dark web.

121.   Plaintiff Doe does not recall ever learning that her PII was compromised in former a data breach incident, other than the breach at issue in this case.

122.   Plaintiff Doe is very careful about sharing sensitive PII. She stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the Internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

123.   Defendant deprived Plaintiff Doe of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Data Breach. Indeed, Plaintiff Doe has not yet received individual notice.

124.   Plaintiff Doe suffered actual injury from the exposure of her PII — which violates her rights to privacy.

125.   Plaintiff Doe suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII are forms of intangible property— property that Defendant was required to adequately protect.

126.   As a result of the Data Breach, Plaintiff Doe has spent multiple hours and made reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring her credit information. Plaintiff anticipates spending considerable

money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

127.   Plaintiff Doe will continue to spend considerable time and effort monitoring her accounts to protect herself from identity theft for the remainder of her life that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

128.   Plaintiff Doe fears for her personal financial security. Plaintiff Doe has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach, and how the exposure and loss of her Social Security number will impact her. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

129.   Plaintiff Doe is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's failure to promptly inform Plaintiff Doe about the Data Breach.

130.   Plaintiff Doe has experienced a substantial increase in scam and spam phone calls and text messages following the Data Breach, which indicates her PII is already in the hands of criminals.

131.   Once an individual's PII are for sale and accessible on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even

more information.[46] On information and belief, Plaintiff Doe's name, address, and Social Security number were compromised as a result of the Data Breach.

132.    Plaintiff Doe has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendant's possession is protected and safeguarded from future breaches.

### *Plaintiff Edward Ndiba's Experience and Injuries*

133.    Plaintiff Edward Ndiba is a former employee of Defendant and a data breach victim.

134.    At the time of the Data Breach, Plaintiff Ndiba's PII, including his name, Social Security number, date of birth, financial information, and address were stored on Defendant's systems.

135.    As a condition of receiving employment, Defendant required Plaintiff Ndiba to provide his PII.

136.    Plaintiff Ndiba provided his PII to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

137.    Additionally, Plaintiff Ndiba reasonably expected that his personal information would be destroyed once his employment with Defendant ended.

---

[46] *What do Hackers do with Stolen Information,* AURA, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited May 23, 2025).

138.   As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff Ndiba's PII for theft by cybercriminals and sale on the dark web.

139.   Plaintiff Ndiba does not recall ever learning that his PII was compromised in former a data breach incident, other than the breach at issue in this case.

140.   Plaintiff Ndiba is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the Internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendant had he known of Defendant's lax data security policies.

141.   Defendant deprived Plaintiff Ndiba of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach. Indeed, Plaintiff Ndiba has not yet received individual notice.

142.   Plaintiff Ndiba suffered actual injury from the exposure of his PII — which violates his rights to privacy.

143.   Plaintiff Ndiba suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property— property that Defendant was required to adequately protect.

144.   As a result of the Data Breach, Plaintiff Ndiba has spent at least three hours making reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit information. Plaintiff anticipates spending considerable

time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

145.    Plaintiff Ndiba will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft for the remainder of his life that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

146.    Plaintiff Ndiba fears for his personal financial security. Plaintiff Ndiba has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach, and how the exposure and loss of his Social Security number will impact him. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

147.    Plaintiff Ndiba is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's failure to promptly inform Plaintiff Ndiba about the Data Breach.

148.    Plaintiff Ndiba has experienced a substantial increase in scam and spam phone calls and text messages following the Data Breach, which indicates his PII is already in the hands of criminals.

149.    Once an individual's PII is for sale and accessible on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even

CONSOLIDATED CLASS ACTION COMPLAINT

more information.[47] On information and belief, Plaintiff Ndiba's name, Social Security number, date of birth, financial information, and address were compromised as a result of the Data Breach.

150.    Plaintiff Ndiba has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendant's possession despite the fact he is no longer employed by Defendant, is protected and safeguarded from future breaches.

### *Plaintiff Charles Rodden's Experience and Injuries*

151.    Plaintiff Charles Rodden is a former employee of Defendant and a data breach victim.

152.    At the time of the Data Breach, Plaintiff Rodden's PII, including his name, Social Security number, and financial account information were stored on Defendant's systems. Plaintiff Rodden also believes he provided Defendant with his driver's license and tax information.

153.    As a condition of receiving employment, Defendant required Plaintiff Rodden to provide his PII.

154.    Plaintiff Rodden provided his PII to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

---

[47] Ryan Toohil, *What do Hackers do with Stolen Information,* AURA (Sept. 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited September 15, 2025).

155.   Additionally, Plaintiff Rodden reasonably expected that his personal information would be destroyed once his employment with Defendant ended.

156.   As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff Rodden's PII for theft by cybercriminals and sale on the dark web.

157.   Plaintiff Rodden does not recall ever learning that his PII was compromised in former a data breach incident, other than the breach at issue in this case.

158.   Plaintiff Rodden is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the Internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendant had he known of Defendant's lax data security policies.

159.   Defendant deprived Plaintiff Rodden of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach. Indeed, Plaintiff Rodden has not yet received individual notice.

160.   Plaintiff Rodden suffered actual injury from the exposure of his PII — which violates his rights to privacy.

161.   Plaintiff Rodden suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property— property that Defendant was required to adequately protect.

162.   As a result of the Data Breach, Plaintiff Rodden has spent approximately ten to fifteen hours making reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit information. Plaintiff anticipates spending considerable money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

163.   Plaintiff Rodden will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft for the remainder of his life that he otherwise would have spent on other activities, including but not limited to work and/or recreation.

164.   Plaintiff Rodden fears for his personal financial security. Plaintiff Rodden has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach, and how the exposure and loss of his Social Security number will impact him. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

165.   Plaintiff Rodden is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's failure to promptly inform Plaintiff Rodden about the Data Breach.

166.   Plaintiff Rodden has experienced a substantial increase in scam and spam phone calls and text messages following the Data Breach, which indicates his PII is already in the hands of criminals.

167.    Once an individual's PII is for sale and accessible on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[48] On information and belief, Plaintiff Rodden's name and Social Security number were compromised as a result of the Data Breach.

168.    Plaintiff Rodden has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendant's possession despite the fact he  is no longer employed by Defendant, is protected and safeguarded from future breaches.

### ***Plaintiffs and the Class Suffered Common Injuries and Damages Due to Defendant's Conduct***

169.    Defendant's failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' PII directly and proximately injured Plaintiffs and Class Members by the resulting disclosure of their PII in the Data Breach.

170.    Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

        a.    identity theft and fraud;

        b.    loss of time to mitigate the risk of identity theft and fraud;

---

[48] Ryan Toohil, *What do Hackers do with Stolen Information,* AURA (Sept. 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited September 15, 2025).

c.      diminution in value of their PII;

d.      out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

e.      lost benefit of the bargain and opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, inter alia, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.      delay in receipt of tax refund monies;

g.      loss of the opportunity to control how their PII is used;

h.      compromise and continuing publication of their PII;

i.      unauthorized use of their stolen PII;

j.      invasion of privacy; and

k.      continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

### *Significant Risk of Continued Identity Theft*

171.   Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

172.   The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

173.   The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a

-35-
CONSOLIDATED CLASS ACTION COMPLAINT

specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

174.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

175.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[49] Criminals in particular favour the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance.

176.    For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[50]    This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

---

[49] *What Is the Dark Web?* EXPERIAN, available at https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited May 23, 2025).
[50] *Id.*

177.   The unencrypted PII of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' PII.

178.   The value of Plaintiffs' and Class's PII on the black market is considerable. Stolen PII trades on the black market for years and is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained. criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

179.   It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

180.   Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

181.   For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing

additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

182.    Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[51]

183.    One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[52] These dossiers are both shockingly accurate and comprehensive. With

---

[51] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited May 23, 2025).

[52] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See,*

---

CONSOLIDATED CLASS ACTION COMPLAINT

"Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

184.    The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

185.    According to the FBI's Internet Crime Complaint Center (IC3) 2024 Internet Crime Report, Internet-enabled crimes reached their highest number of

---

*e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited May 23, 2025).

complaints and dollar losses that year, resulting in more than $6.5 billion in losses to individuals and business victims.[53]

186.    Further, according to the 2019 FBI Internet Crime Report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[54] Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their PII was stolen.  Defendant's failure to promptly and properly notify Plaintiffs and Class members of the Data Breach exacerbated Plaintiffs and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

187.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

188.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future

---

[53] *2024 Internet Crime Report*, www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf (last visited October 2, 2025).

[54] *2019 Internet Crime Report* (Feb. 11, 2020) FBI.GOV, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited October 2, 2025).

inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

189. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

190. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

191. In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.

192. Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS")

found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[55]

193.    The 2017 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

• 75% of respondents reported feeling severely distressed;

• 67% reported anxiety;

• 66% reported feelings of fear related to personal financial safety;

• 37% reported fearing for the financial safety of family members;

• 24% reported fear for their physical safety;

• 15.2% reported a relationship ended or was severely and negatively impacted by identity theft; and

• 7% reported feeling suicidal.[56]

194.    Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

• 48.3% of respondents reported sleep disturbances;

• 37.1% reported an inability to concentrate / lack of focus;

• 28.7% reported they were unable to go to work because of physical symptoms;

---

[55] *Victims of Identity Theft,* Bureau of Justice Statistics (Sept. 2015) http://www.bjs.gov/content/ pub/pdf/vit14.pdf (last visited July 10, 2025).
[56] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT

• 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

• 12.6% reported a start or relapse into unhealthy or addictive behaviors.[57]

195.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

196.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

197.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[58]

---

[57] *Id.*

[58] *See Federal Trade Commission*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited May 23, 2025).

198.   Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

### *Diminished Value of PII*

199.   Personal data like PII is a valuable property right.[59]

200.   Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

201.   An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[60]

202.   In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[61]

---

[59] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last visited May 23, 2025).
[60] *Shadowy data brokers make the most of their invisibility cloak* (Nov. 5, 2019) LA Times, (last visited May 23, 2025).https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[61]   *The Personal Data Revolutaion,* DATA COUP, https://datacoup.com/ *and How it Works,* DIGI.ME, https://digi.me/what-is-digime/  (last visited May 23, 2025).

Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[62]

203.    As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

204.    However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### Future Cost of Credit and ID Theft Monitoring is Reasonable and Necessary

205.    To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

206.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes— *e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

---

[62] *Frequently Asked Questions*, NIELSE COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited May 23, 2025).

207.   Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

208.   Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement.[63]

209.   The information disclosed in this Data Breach (Social Security numbers) is impossible to "close" and difficult, if not impossible, to change.

210.   Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

211.   The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

---

[63] Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds,* FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-securitynumber-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited May 23, 2025).

***Lost Benefit of the Bargain***

212.   Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

213.   When agreeing to provide their PII, which was a condition precedent to obtain employment from Defendant, Plaintiffs and Class Members, as employees, understood and expected that they were, in part, paying for services and data security to protect the PII they were required to provide.

214.   Plaintiffs value data security. Indeed, data security is an important consideration of seeking employment.

215.   In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[64] Therein, Cisco reported the following:

>    a.   "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[65]

---

[64] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited May 23, 2025).
[65] *Id.* at 3.

b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[66]

c.    89% of consumers stated that "I care about data privacy."[67]

d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[68]

e.    51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[69]

f.    75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[70]

216.   Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

### *Defendant Failed to Adhere to FTC Guidelines*

217.   According to the FTC, the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

---

[66] *Id.*
[67] *Id.* at 9.
[68] *Id.*
[69] *Id.*
[70] *Id.* at 11.

218.   In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.   The guidelines explain that businesses should:

a.   protect the personal customer information that they keep;

b.   properly dispose of personal information that is no longer needed;

c.   encrypt information stored on computer networks;

d.   understand their network's vulnerabilities; and

e.   implement policies to correct security problems.

219.   The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

220.   The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

221.   The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from

these actions further clarify the measures businesses must take to meet their data security obligations.

222.   Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### *Defendant Failed to Comply with the Gramm-Leach-Bliley Act*

223.   Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

224.   The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

225.   Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendant were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA statutes.

226.   The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R.

§ 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

227.    Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

228.    Both the Privacy Rule and Regulation P require financial institutions to provide consumers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

229.    Upon information and belief, Defendant failed to provide annual privacy notices to consumers after the relationship ended, despite retaining these consumers' PII and storing that PII on Defendant's network systems.

230.    Defendant failed to adequately inform their consumers that they were storing and/or sharing, or would store and/or share, the consumers' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the relationship ended.

231.    The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of consumer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of consumer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of consumer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

232.    As alleged herein, Defendant violated the Safeguards Rule.

233.    Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of consumer information.

234.    Defendant violated the GLBA and its own policies and procedures by sharing the PII of Plaintiffs and Class members with a non-affiliated third party without providing Plaintiffs and Class Member (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

### *Defendant Failed to Follow Industry Standards*

235.    Experts studying cybersecurity routinely identify financial corporations as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

236.    Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[71] All organizations collecting and handling PII, such as Defendant, are strongly encouraged to follow these controls.

237.    Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

---

[71] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Jun. 11, 2025).

238.   Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

239.   Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, Defendant should have promptly deleted the data belonging to former customers and employees.

240.   Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

241.   These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

242.   Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach.

243.   Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including its staff and immediate family.

244.   Plaintiffs reserve the right to amend the class definition.

245.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of her claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

246.   This action satisfies the numerosity, commonality, typicality, and adequacy requirements.

247.   **Numerosity.** The Class members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes thousands of members.

248.   **Commonality and Predominance.** Plaintiffs' and the Class Members' claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide

proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

     a.    if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

     b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

     c.    if Defendant was negligent in maintaining, protecting, and securing PII;

     d.    if Defendant breached contract promises to safeguard Plaintiffs and the Class's PII;

     e.    if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

     f.    if Defendant's Breach Notice was reasonable;

     g.    if the Data Breach caused Plaintiffs and the Class injuries;

     h.    what the proper damages measure is; and

     i.    if Plaintiffs and the Class are entitled to damages and or injunctive relief.

249. **Typicality.** Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

250. **Adequacy.** Plaintiffs will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class Members'

interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

251. **Appropriateness.** The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case. Plaintiffs are not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

252. **Ascertainability.**  All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some victims and sent them data breach notices.

<u>**FIRST CAUSE OF ACTION**</u>
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

253. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

254. Defendant requires its client's customers to submit non-public PII as a condition of risk adjustment services, software, and solutions. Defendant gathered and stored the PII of Plaintiffs and Class Members as part of its business, which affects commerce.

255. Plaintiffs and Class Members entrusted Defendant with their PII with the understanding that the information would be safeguarded against the foreseeable threat of a cyberattack designed to acquire that information.

256.    Defendant knew and understood that cyberattacks are a foreseeable risk against which it was required to protect. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if their PII were wrongfully disclosed.

257.    By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

258.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

259.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove its former clients' customers' PII they were no longer required to retain pursuant to regulations.

260.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach, but failed to do so.

261.    Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiffs and Class Members, on the other hand. That special relationship arose because Defendant was entrusted with their confidential PII as a condition of receiving risk adjustment services, software, and solutions with Defendant.

262.    California Courts analyze six factors to determine the existence of a special relationship with no single factor being required or dispositive: (1) the extent

CONSOLIDATED CLASS ACTION COMPLAINT

to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.

263.    Here, each factor is satisfied as (1) the transactions in which Plaintiffs provided their PII to Defendant were for the purpose of receiving healthcare services; (2) data breaches targeting PII are readily foreseeable and the subject of frequent warnings by data security experts and state and federal governments; (3) the injuries associated with the theft and misuse of Plaintiffs' PII, including the expenditure of time and money mitigating the consequences of a data breach are alleged by Plaintiffs; (4) the theft of PII and Plaintiffs' allegations that Defendant failed to implement reasonable data security measures is logically connected to and proximately caused by the Data Breach; (5) the moral blame associated with Defendant's collection and use of Plaintiffs' PII for its own profit while failing to fund data security measures intended to protect Plaintiffs' PII from the foreseeable consequences of a data breach is high; and (6) imposing liability of Defendant for failing to safeguard PII will further California state policy of ensuring that personal information is protected and preventing the theft and misuse of PII by criminals.

264.    Defendant had duties arising under the FTC Act and The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b) (and similar state statutes) to protect Plaintiffs' and Class Members' PII.

265.   Defendant breached its duties to Plaintiff and Class Members under the FTC Act and the Safeguards Rule by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

266.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

267.   Defendant's violations of Section 5 of the FTC Act and The Safeguards Rule (and similar state statutes) constitute negligence per se.

268.   Plaintiffs and Class Members are consumers within the class of persons that these statutes were intended to protect and the harm that has occurred is the type of harm these statutes were intended to guard against.

269.   Plaintiffs and Class Members were foreseeable victims of Defendant's violations of the FTC Act the Safeguards Rule and state data security and consumer protection statutes. Defendant knew or should have known that its failure to implement reasonable data security measures to protect and safeguard Plaintiffs' and Class Members' PII would cause damage to Plaintiffs and the Class.

270.   The harm that has occurred is the type of harm the FTC Act and the Safeguards Rule is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

271.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described herein, but also

because Defendant is bound by industry standards to protect confidential PII. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain pursuant to regulations.

272. Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

273. Defendant had and continues to have duties to adequately disclose that Plaintiffs' and Class Members' PII within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

274. Defendant breached its duties and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b.    Failing to adequately monitor the security of their networks and systems for unauthorized access or the transfer of large volumes of data;

c.    Failing to encrypt or limit access to Class Members' PII;

d.    Failing to detect in a timely manner that Class Members' PII had been compromised;

e.    Failing to remove former clients' customers' PII they were no longer required to retain pursuant to regulations; and

f.    Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

275.   Defendant breached its duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

276.   Defendant knew or should have known that its failure to implement reasonable data security measures to protect and safeguard Plaintiffs' and Class Members' PII would cause damage to Plaintiffs and the Class.

277.   A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

278.   Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have

known of the inherent risks in collecting and storing PII, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on its systems.

279.    Plaintiffs and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

280.    Defendant was in an exclusive position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

281.    Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

282.    But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and the Class, Plaintiffs' and Class Members' PII would not have been compromised.

283.    There is a close causal connection between Defendant's failure to implement security measures to protect Plaintiffs' and Class Members' PII, and the harm, or risk of imminent harm suffered by Plaintiffs and the Class. PII was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care by adopting, implementing, and maintaining appropriate security measures.

284.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit

of the bargain; (vi) an increase in spam calls, texts, and/or emails (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the value of the unauthorized access to their PII permitted by Defendant; and (xi) any nominal damages that may be awarded.

285.   As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses including nominal damages.

286.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

287.   Defendant's negligent conduct is ongoing, in that it still possesses Plaintiffs' and Class Members' PII in an unsafe and insecure manner.

288.   Plaintiffs and Class Members are entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## SECOND CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class)

289.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

290.    Through their course of conduct, Defendant, Plaintiffs, and Class Members entered into an implied contract for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class Members' PII.

291.    For example, Defendant offered to provide employment and/or services to Plaintiffs and members of the Class if, and in exchange, Plaintiffs and members of the Class provided Defendant with their PII. In turn, Defendant agreed it would not disclose the PII it collects to unauthorized persons.

292.    Plaintiffs and the members of the Class accepted Defendant's offer by providing PII to Defendant in exchange for Defendant's services.

293.    Implicit in the parties' agreement was that Defendant would provide Plaintiffs and members of the Class with reasonable, prompt, and adequate notice of all unauthorized access and/or theft of their PII.

294.    Plaintiffs and the members of the Class would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

295.    Defendant materially breached the contracts it had entered with Plaintiffs and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusions into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiffs and members of the Class by:

a.    Failing to properly safeguard and protect Plaintiffs' and members of the Class's PII;

b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement;

c.    Failing to ensure the confidentiality and integrity of electronic PII that Defendant created, received, maintained, and transmitted; and

d.    Failing to delete the PII of Plaintiffs and Class Members once Defendant no longer had a reasonable need to maintain it.

296.   The damages sustained by Plaintiffs and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

297.   Plaintiffs and members of the Class have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

298.   The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

299.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

300.   Defendant failed to send adequate Notice to the victims promptly.

301.   In these and other ways, Defendant violated its duty of good faith and fair dealing.

302.   Plaintiffs and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

303.   Plaintiffs, on behalf of themselves and the Class, seeks compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

304.   Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

305.   Upon information and belief, Defendant funds its data security measures from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

306.   As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

307.   Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they either provided services, in the form of employment, or purchased services from Defendant and/or its agents and in so doing provided Defendant or its agents with their PII. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

308.   Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes.

309.   Plaintiffs and Class Members conferred a monetary benefit on Defendant, by paying Defendant as part of Defendant rendering services, a portion of which was to have been used for data security measures to secure Plaintiffs' and Class Members' PII, and by providing Defendant with their valuable PII.

310.   Defendant was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to avoid the data security obligations at the expense of Plaintiffs and the Class by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

311.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members,

because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

312.    Defendant acquired the monetary benefit and PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

313.    If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant either directly or through their own financial institutions.

314.    Plaintiffs and Class Members have no adequate remedy at law.

315.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity how their PII is used; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the

PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

316.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm.

317.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**FOURTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §17200 *et seq.***
**(On Behalf of Plaintiffs and the Class)**

318.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

319.    Defendant is a "person" defined by Cal. Bus. & Prof. Code § 17201.

320.    Defendant violated Cal. Bus. & Prof. Code § 17200 et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

321.    Defendant violated Cal. Bus. and Prof. Code § 17200, *et seq.*, by engaging in unlawful and unfair business acts and practices as defined in Cal. Bus. Prof. Code § 17200.

322.    The acts and omissions identified herein were conceived of, directed from, and emanated from Defendant's California headquarters and harmed consumers nationwide.

323.    Defendant engaged in unlawful acts and practices by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and Class Members' PII with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and Class Members' PII in an unsecure electronic environment in violation of California's data breach statutes, Section 5 of the FTC Act, FTC Act, 15 U.S.C. §45, California Customer Records Act, California Civil Code § 1798.81.5, and 45 C.F.R. § 160.103 which require Defendant to take reasonable methods of safeguarding the PII of Plaintiffs and the Class Members.

324.    In addition, Defendant engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82.

325.    Defendant's "unfair" acts and practices include: utilizing cheaper, ineffective security measures and diverting funds to its own profit, instead of providing a reasonable level of security that would have prevented the hacking incident; failing to follow industry standard and the applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data; failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' personal information.

326. Defendant's conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and Class Members. Further, Defendant's conduct narrowly benefited its own business interests at the expense of Plaintiffs' and Class Members' fundamental property and privacy interests protected by the California Constitution and the common law.

327. Defendant's actions caused damage to and loss of Plaintiffs' and Class Members' property right to control the dissemination and use of their personal information and communications. Defendant was in an exclusive position to protect the PII and Plaintiffs and Class Members had no way of reasonably avoiding the injury.

328. As a direct and proximate result of Defendant's violation of the UCL, Plaintiffs and Class Members lost money or property, including, but not limited to benefit of the bargain losses in the form of monies paid to Defendant and intended to be devoted to data security, lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, and actual misuse of the compromised data.

329. Defendant knew or should have known that Defendant's computer systems and data security practices were inadequate to safeguard Plaintiffs' and Class Members' PII and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unlawful and unfair practices and acts were knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Class Members.

330.    Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order from this Court enjoining Defendant from continuing to engage, use, or employ its unfair business practices.

Plaintiffs and the Class Members have suffered injury-in-fact and would not have done business with Defendant if they had known that their association would put their PII at risk. Plaintiffs and the Class would not have given Defendant their PII had they known that their PII was vulnerable to a data breach. Likewise, Plaintiffs and Class Members seek an order mandating that Defendant implement adequate security practices to protect Class Members' PII. Additionally, Plaintiffs and the Class Members seek and request an order awarding Plaintiffs and the Class restitution of the money wrongfully acquired by Defendant by means of Defendant's unfair and unlawful practices.

## FIFTH CAUSE OF ACTION
### Invasion of Privacy
### (On Behalf of Plaintiffs and the Class)

331.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

332.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties by applicable laws set forth herein, including but not limited to, state and federal privacy and consumer protection statutes, California common law, and the California Constitution, Art. 1, § 1.

333.    Defendant owed a duty to Plaintiffs and Class Member to keep their PII confidential.

-73-
CONSOLIDATED CLASS ACTION COMPLAINT

334.    Defendant's implementation of inadequate data security measures, its failure to resolve vulnerabilities and deficiencies, and its abdication of its responsibility to reasonably protect data it required Plaintiffs and the Class to provide and store on its own servers constitutes a violation Plaintiffs and the Class's right to privacy.

335.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' PII, is highly offensive to a reasonable person. It constitutes an invasion of privacy both by disclosure of nonpublic facts, and intrusion upon seclusion.

336.    Defendant's reckless and negligent failure to protect Plaintiffs' and Class Members' PII constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

337.    Defendant's failure to protect Plaintiffs' and Class Members' PII acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

338.    Defendant knowingly did not notify Plaintiffs' and Class Members in a timely fashion about the Data Breach.

339.    Because Defendant failed to properly safeguard Plaintiffs' and Class Members' PII, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

340.   As a proximate result of Defendant's acts and omissions, the PII of Plaintiffs and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

341.   Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII is still maintained by Defendant with their inadequate cybersecurity system and policies.

342.   Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their PII. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

343.   Plaintiffs and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' PII.

344.   Plaintiffs and Class Members seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## SIXTH CAUSE OF ACTION
### Declaratory Judgment
### (On Behalf of Plaintiffs and the Class)

345.   Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

346.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

347.    In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

348.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

    b.    Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

    c.    Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

    d.    Defendant's breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class members.

349.    The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it. Among other things, this should include the following:

a.  Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

b.  Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

i.  engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii.  engaging third-party security auditors and internal personnel to run automated security monitoring;

iii.  auditing, testing, and training its security personnel regarding any new or modified procedures;

iv.  segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

v.  conducting regular database scanning and security checks;

vi.  routinely and continually conducting internal training and education to inform internal security personnel how to

CONSOLIDATED CLASS ACTION COMPLAINT

identify and contain a breach when it occurs and what to do in response to a breach; and

vii.    meaningfully educating its users about the threats they face with regard to the security of their PII, as well as the steps Defendant's employees should take to protect themselves.

350.  If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

351.  And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class members' injuries.

352.  If an injunction is not issued, the resulting hardship to Plaintiffs and Class members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

353.  An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class members, and the public at large.

CONSOLIDATED CLASS ACTION COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of all others similarly situated, pray for relief as follows:

    a.  For an order certifying the Class, and naming Plaintiffs as representatives of the Class, and Plaintiffs' attorneys as Class Counsel;

    b.  For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

    c.  For damages in an amount to be determined by the trier of fact;

    d.  For an order of restitution and all other forms of equitable monetary relief;

    e.  Declaratory and injunctive relief as described herein;

    f.  Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses as otherwise allowed by law;

    g.  Awarding pre- and post-judgment interest on any amounts awarded; and

    h.  Awarding such other and further relief as may be just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs, individually and on behalf of the putative Class, demand a trial by jury on all claims so triable.

Dated: October 10, 2025                    By: */s/ Carly Roman*
                                           Carly M. Roman (SBN 349895)
                                           **STRAUSS BORRELLI PLLC**
                                           980 N. Michigan Avenue, Suite 1610
                                           Chicago, IL 60611
                                           Telephone: (872) 263-1100
                                           croman@straussborrelli.com

                                           John J. Nelson (SBN 317598)
                                           **MILBERG COLEMAN BRYSON
                                           PHILLIPS GROSSMAN, LLC**
                                           280 S. Beverly Drive-Penthouse Suite
                                           Beverly Hills, CA 90212
                                           Telephone: (858) 209-6941
                                           jnelson@milberg.com

                                           Kristen Lake Cardoso (SBN 338762)
                                           **KOPELOWITZ OSTROW P.A.**
                                           1 West Las Olas Blvd., Ste. 500
                                           Fort Lauderdale, FL 33301
                                           Telephone: (954) 525-4100
                                           cardoso@kolawyers.com

                                           Miles M. Schiller (*phv forthcoming*)
                                           **STRANCH, JENNINGS, & GARVEY,
                                           PLLC**
                                           223 Rosa Parks Ave. Suite 200
                                           Nashville, TN 37203
                                           Telephone: (615) 254-8801
                                           mschiller@stranchlaw.com

                                           Tanner R. Hilton (*phv forthcoming*)
                                           **FEDERMAN & SHERWOOD**
                                           10205 N. Pennsylvania Ave.
                                           Oklahoma City, OK 73120
                                           Telephone: (405) 235-1560
                                           wbf@federmanlaw.com

                                           *Attorneys for Plaintiffs and the Proposed
                                           Class*

## **<u>CERTIFICATE OF SERVICE</u>**

I, Carly M. Roman, hereby certify that on October 10, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record, via the ECF system.

DATED this 10th day of October, 2025.

STRAUSS BORRELLI PLLC


By:  */s/ Carly M. Roman*
Carly M. Roman
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

-81-
CONSOLIDATED CLASS ACTION COMPLAINT